**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

USCOC of New Hampshire
RSA #2, Inc., a Delaware
Corp., d/b/a US Cellular

      v.                                  Civil No. 05-cv-327-PB

Town of Bow, NH, et al.,
Defendants


**AMENDED REPORT AND RECOMMENDATION**

       Plaintiff USCOC of New Hampshire RSA # 2 ("US Cellular") is a provider of personal wireless telecommunication service ("PWS") and has brought this action under § 704 of The Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7) (the "TCA"), in further pursuit of its efforts to fill a significant gap in its service to portions of the Town of Bow, New Hampshire ("Town" or "Bow"). US Cellular initially sought a variance from Bow's Zoning Board of Adjustment ("ZBA") to construct a 125-foot PWS facility on residential property on Wood Hill, located within a rural zone of Bow.  Several residents opposed the proposal.  Among the residents who opposed the proposed facility are Lee and Joan Herrington, who also are intervenors in this action (the "Herringtons" or "intervenors").  After a lengthy deliberative

process, the ZBA denied US Cellular's application for a variance on August 23, 2005.  Because US Cellular could not proceed with construction of the proposed facility without that variance, it commenced this action in September 2005, seeking to invoke the preemptive power of this court authorized by the TCA.

Currently before the court for a recommendation of disposition are cross motions for summary judgment, filed by the plaintiff and the intervenors.  <u>See</u> Document nos. 25 and 45.  The parties dispute whether the ZBA denial of the variance request is supported by substantial evidence, as required by 47 U.S.C. § 337(c)(7)(B)(iii), and, if so, whether Bow's zoning regulations effectively prohibit US Cellular from providing wireless service to Bow, in violation of 47 U.S.C. § 337(c)(7)(B)(i)(II).  As explained below, I recommend that plaintiff's motion be denied and the intervenors' motion be granted.

**Discussion**

1.  <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), a party is entitled to judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact."  A "genuine issue" is one which raises a factual dispute which could be resolved in favor of either party, and a "material fact" is one that could affect the ultimate disposition of the matter.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001).  The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo, 394 F.3d 40, 42 (1st Cir. 2005).

The evidence submitted in support of the motion must be considered in the light most favorable to the non-moving party. See Navarro, 261 F.3d at 94.  While all reasonable inferences must be indulged in favor of the party opposing summary judgment, conclusory allegations, improbable inferences, or unsupported speculation cannot defeat summary judgment.  See Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002).  Instead, if the moving party demonstrates that no genuine issue of material fact exists, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the

appropriate proof burden, could base a verdict for it; if that
party cannot produce such evidence, the motion must be granted."
Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st
Cir. 1996) (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S.
at 249); see also Rojas-Ithier, 394 F.3d at 43 (finding summary
judgment appropriate against a party that fails to establish an
essential element of its case).

Here both the plaintiff and the intervenors have moved for
summary judgment.  Both sides argue the record contains no
genuine issue of material fact and that judgment can be entered
in favor of their respective positions.  On cross motions for
summary judgment, the standard of review is applied to each
motion separately.  See Am. Home Assur. Co. v. AGM Marine
Contractors, 467 F.3d 810, 812 (1st Cir. 2006) (applying standard
to each motion where cross motions were filed); see also Mandel
v. Boston Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The
presence of cross-motions for summary judgment neither dilutes
nor distorts this standard of review.").

Plaintiff first claims the ZBA's decision denying its
request for a variance is not supported by substantial evidence,
in violation of 47 U.S.C. § 332(c)(7)(B)(iii) (requiring local

4

decisions on requests to construct PWS facilities to be supported
by substantial evidence contained in a written record).  If
plaintiff is correct, then the local decision may be pre-empted
to effectuate the wireless service goals enunciated in the TCA.
See Second Generation Props. v. Town of Pelham, 313 F.3d 620, 627
(1st Cir. 2002) (explaining the balance between local zoning
authority and national policy goals struck in the TCA).  "The
substantial evidence test is highly deferential to the local
board.. . . Judicial review under this standard, even at the
summary judgment stage, is narrow."  Id.  The court is limited to
reviewing only the administrative record to see if it contains
substantial evidence to support the local board's decision.  See
id.  Substantial evidence is "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  Id. (citing Sw. Bell Mobile Sys. v. Todd, 244 F.3d
51, 58 (1st Cir. 2001)).  Significantly, if the evidence can
support one of two conclusions, the court must affirm the
administrative agency's decision on summary judgment and not
substitute its own judgment for that of the local board.  See id.
(citing Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297
F.3d 14, 20-21 (1st Cir. 2002); see also Sw. Bell Mobile Sys.,

244 F.3d at 58 (contradictory evidence does not undermine substantial evidence finding).

Plaintiff's second claim charges the ZBA decision to deny its variance application effectively prohibits it from providing wireless service to Bow, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). Unlike a substantial evidence claim, an effective prohibition claim may be based on newly proffered evidence and is reviewed *de novo*. See Second Generation, 313 F.3d at 629 (citing authority). The anti-prohibition clause "present[s] questions that a federal district court determines in the first instance without any deference to the board." Nat'l Tower, 297 F.3d at 22. Additional evidence may supplement the administrative record in order to resolve the dispute. See id. Summary judgment appropriately follows if the submitted facts demonstrate no genuine disputes of material fact. See Nextel Commc'ns v. Town of Wayland, 231 F. Supp. 2d 396, 408 (D. Mass. 2002) (explaining how TCA claims reviewed de novo are treated like all other federal claims on summary judgment).

With these standards in mind, I turn to the summary judgment motions before the court. The facts are discussed in the context of the two separate claims, because they are subject to different

standards of review.  Only those facts relevant to the
disposition of the two claims are considered.  Unless otherwise
indicated, the facts are undisputed.

    2.  <u>Factual Background</u>

       **a.  Significant Gap in Coverage**

US Cellular has a significant gap in its wireless service to
a large portion of western Bow, including Bow center and points
south.  In 2003, US Cellular decided to fill that gap and hired
Kenneth J. Kozyra, a principal of KJK Wireless consulting firm
("Kozyra"), to facilitate its effort to find a suitable site and
obtain the requisite approvals.[1]  US Cellular sought a location
high enough to enable its facility to propagate radio frequencies
to customers' cell phones without interference from the hills,
ledges and trees that dominate the Bow landscape.  Kozyra studied
an area of western Bow including Tower Hill (also known as Picket
Hill) and Wood Hill, and concluded that Wood Hill would be the
preferable location.  <u>See</u> Pl.'s Br. Summ. J., Attachment 1,
Kozyra Decl. ("Kozyra Decl.") ¶¶ 5-8.

---

[1]Because Kozyra has served as US Cellular's agent throughout
the approval process before the ZBA, both parties represent
plaintiff's position here and are analyzed as though they were a
single entity.

Kozyra determined a facility on Wood Hill would have minimal visual impact, because its high elevation would enable the tower to be of relatively modest height, its flat top would enable the base to be well-shielded with vegetation, and the relatively unpopulated area meant few neighbors would abut the facility. See id. ¶¶ 8-10.  The Wood Hill area of Bow, however, has unique scenic vistas of several New Hampshire mountain peaks as well as expensive homes built to take advantage of those views.  At the time, the area was zoned for rural and residential uses and disallowed PWS facilities.[2]  Despite that fact, US Cellular proceeded to lease a 5 acre parcel of land at 54 Wood Hill Road for the proposed facility (the "Wood Hill site") and planned to obtain a variance from the ZBA.  In an effort to minimize the visual impact of the facility, plaintiff proposed a tower

_____

[2]Since this action commenced and the variance at issue was denied, Bow amended its zoning ordinance and now allows PWS facilities throughout the town with a "conditional use" permit. See Intervenors' Mem. in Supp. of Cross-Motion for Summ. J. (document no. 44), Exhibit A (document nos. 44-1 and 56) (amended Article 7.10, at subsection C, to permit PWS facilities "as a principal or accessory (secondary) use in all zoning districts within the Town of Bow").  The amendment is relevant to the effective prohibition claim and is discussed there.  See supra, § 4 at 37-38.  The administrative record, however, is based on the status of the local zoning law before the amendment, which disallowed PWS facilities in more than 87% of Bow and in all of the area where plaintiff had a gap in its service coverage.

8

disguised as a pine tree (a "monopine") and limited its height to 125 feet, with an additional 6 foot cap on top.

Prior to filing its variance application, US Cellular contacted the Bow Historical Commission to inquire whether the proposed facility would have an adverse impact on, or present concerns about, any historic properties in the area.  The Historical Commission responded on October 12, 2004, that the land had historical significance because it was the longtime homestead/residence of Mr. James Langley, a prominent citizen and local newspaper editor and publicist.  The Historic Commission also cited the 2004 Bow Master Plan, which listed the Wood Hill area in its "Natural, Cultural, and Historical Resources Inventory" because of its scenic views of the White Mountains. See Kozyra Decl., Ex. D.  Nonetheless, US Cellular proceeded with its plans to fills its coverage gap by erecting the monopine at the Wood Hill site.

### b.  The Variance Application Proceedings

On November 4, 2004, plaintiff filed its variance application with the ZBA.  It presented evidence to demonstrate how US Cellular satisfied the criteria for a variance set forth in Bow's Zoning Ordinance, Article 13.02.B.2.  Three real estate

valuation reports were submitted with the variance application to demonstrate that PWS facilities did not adversely affect property values.  See Kozyra Decl. Exs. I, J and K.  The application contained "Coverage Plots & 20-Mile Radius Map" to demonstrate how radio frequencies from this elevation would reach customers who live or travel along roads in western Bow, and would link into existing facilities in neighboring communities to facilitate US Cellular's goal of providing a complete network of coverage. See Kozyra Decl., Ex. F (application for variance, tab 6).  The application also contained photographs of the proposed site from various angles.  The ZBA determined a site walk and "balloon test," to simulate the height and location of the proposed monopine, would enhance its perception of the facility's impact on the neighborhood and, therefore, postponed further consideration of the application until the site walk occurred. See Kozyra Decl. Ex. G.

     After the site walk, a public hearing was held on January 18, 2005, when the variance application was reviewed in detail. See Kozyra Decl. Ex. K.  At the hearing, Kozyra explained US Cellular had a significant gap in its coverage to the Wood Hill area and along Dunbarton Center Road, Woodhill Hooksett Road and

the Branch Londonderry Turnpike.  Kozyra discussed how the
proposed site, at the proposed height, in combination with its
existing network, would largely, although not entirely, fill that
gap.  See id.  Several ZBA board members questioned the
feasibility of locating the facility on another hill or at a
lower height, since Wood Hill is the highest elevation in Bow.
Kozyra stated there were "no other locations in the Town of Bow
that would give US Cellular the same level of coverage or better,
. . . that would be acceptable to their R[adio] F[requency]
Engineers . . .."  Id. at 8.  Kozyra conceded that another
location could fill the gap if a substantially taller tower were
built.  Id.  Several neighbors appeared at the hearing to express
their opposition to the proposal and submit a petition against
the project signed by 36 residents.  See Def.'s Opp'n Br. to
Pl.'s Summ. J. Mot. (document no. 28) ("Def.'s Opp'n Br."), Ex. 8
(document no. 28.27).  The residents were concerned about the
adverse impact of the facility on views and property values, and
the possible health concerns the RF frequencies could cause.  See
Kozyra Decl. Ex. K at 9–15.

     The ZBA concluded that further information was needed and
continued the hearing to February 15, 2005.  It ordered US

11

Cellular to prepare documentation regarding alternative locations and heights; and it allowed the abutters to submit additional documentation.  The ZBA also decided to hire its own independent RF engineer and real estate appraiser to assist the decision-making process.  <u>See</u> Kozyra Decl. Ex. V.  Over the course of the following three months, the administrative record was supplemented by several expert reports, opinion letters and hearing testimony debating the existence and extent of any adverse impact of the facility at the Wood Hill site, and the feasibility and desirability of alternative locations for the facility.  The February 15 hearing was continued to February 22, and again to March 15, April 19 and finally May 17, 2005, after which the Notice of Decision was issued.  <u>See</u> Kozyra Decl. Exs. U, V, X, CC, GG and HH.

In support of its position, US Cellular supplemented its variance application with several reports.  It submitted a Site Review Report, prepared with the assistance of an RF engineer, Dan Goulet, which analyzed six other sites and concluded plaintiff's choice of the Wood Hill site was the only feasible option "to achieve an optimal balance between meeting coverage objectives, reducing the number of antenna sites required in Bow

and minimizing impact on the neighborhood."  <u>See</u> Kozyra Decl. Ex. L at 8.  Correspondence between Kozyra and the Town of Bow Board of Selectmen indicates that nine additional parcels of public property offered by the Town also were rejected because of anticipated technical and legal barriers.  <u>See</u> Kozyra Decl. Exs. S, T, Y and Z.  US Cellular also submitted a report to the ZBA explaining why the Town properties would not work.  <u>See</u> Kozyra Decl. Ex. Z.  Finally, US Cellular critiqued the independent expert reports, arguing the RF engineer corroborated US Cellular's technical data, while the real estate appraiser did not disprove plaintiff's claim that property values are not diminished because of proximity to PWS towers.  <u>See</u> Kozyra Decl. Exs. DD, EE and FF.

     Public reaction to the proposed facility was overwhelmingly against the sited location.  Opponents of the project focused on the facility's potential negative impact on their property's aesthetic and financial value.  <u>See</u> Kozyra Decl. Exs. M, N, O, and Q.  Three local real estate brokers opined that the size and proximity of the proposed monopine would affirmatively detract from the views the abutting homes enjoy and diminish their value as a result.  <u>See</u> Def.'s Opp'n Br. Ex. 10.  Town residents

proposed using multiple sites with shorter towers, despite the engineering, zoning or business challenges that solution might present.  See e.g., Kozyra Decl. Ex. K at 7, 15–16, Ex. BB at 7, Ex. CC at 12–13.  As noted above, the Town Board of Selectmen offered nine alternative sites to US Cellular and approved a warrant article at Bow's annual meeting authorizing the selectmen to lease town property to US Cellular for construction of its PWS facility.  See id. Ex. 13.  While construction on the Town-owned sites also would require approvals, the parcels were on large tracts of land, generally not close to residences.  See Kozyra Decl. Ex. CC at 12.

Finally, the ZBA considered the results of its two independent experts.  First it reviewed the real estate appraisal report of David Rauseo (the "Rauseo report").  The ZBA had criticized US Cellular's property valuation studies for not using comparable sales correlated to a cell tower or neighborhoods analogous to the Wood Hill area.  See Kozyra Decl. Ex. V at 2. It charged Rauseo with examining sales of homes proximate to transmission towers to similar homes not near a tower, and to report all data irrespective of the positive, negative or neutral impact the tower had.  See Kozyra Decl. Ex. V at 2, Ex. AA at 1.

14

Rauseo compared sales of homes with a "view amenity" proximate to a transmission tower but isolated from other negative external influences, such as highway or commercial noise, to similar homes without a tower influence.  See id.  Rauseo conducted a similar comparison of vacant lots in relation to towers.

The Rauseo report concluded that the presence of a tower did not cause the sales price of a home to reduced, but rather extended the time such a house remained on the market before an interested buyer was found.  It also concluded that the values of vacant lots were adversely affected by the presence of a tower.  "The sales data shows that in some cases the sale price, and most other cases the marketing times, is [sic] sensitive to orientation of the view of a nearby tower."  Kozyra Decl., Ex. AA.  As a result, Rauseo determined that the presence of a tower does negatively impact property values and that it would be prudent to reduce the price of an impacted property to effect a sale within a reasonable market time.  See Kozyra Decl. Exs. AA and CC.  Rauseo explained, however, that there was "no evidence of sales that support an appropriate discount to attract these types of buyers," in part because the owners of the homes at issue usually could afford to hold the property until they got

the price they wanted.

Next, the ZBA considered the findings of Mark Hutchins, the independent RF engineer (the "Hutchins report").  The Hutchins report confirmed US Cellular's need to locate a facility in a rural zone of Bow to fill its coverage gap in western Bow.  See generally Kozyra Decl. Ex. BB (the Hutchins report), Ex. CC at 6–13 (minutes of the 4/19/05 ZBA hearing).  It also confirmed US Cellular's representation that the tower had to be at least 100 feet tall to avoid landscape interference with the radio frequencies emitted.  Hutchins found unreliable, however, US Cellular's projection of the distance the Wood Hill site would be able to propagate radio frequencies.  See Kozyra Decl. Ex. CC at 6.  The report compared the coverage of 125 foot towers on each of Brown Hill, Picket/Tower Hill, Great Hill and South Bow and concluded that, with the exception of South Bow, each of the alternative facilities provided "pretty good coverage," which would adequately serve the critical area if deployed in conjunction with other existing towers.  See id. at 9–10.

Hutchins concluded the best alternative coverage could be achieved from Great Hill at heights of 125, 150 or 190 feet, with coverage effectiveness positively correlated to the height of the

16

tower.  See id.  The report discounted residents' concerns
pertaining to radiation and noise, stating that the TCA removed
health concerns as a factor relevant to the analysis of facility
need or location, and that noise can be mitigated.  See id. at
11.  Ultimately, the Hutchins report concluded that "location at
Great Hill would address some – but not all – of the area of
concern, but with an antenna C/L height much greater than 125
feet."  See Kozyra Decl. Ex. BB at 9.

> ### c.  The ZBA's Decision

Based on all the submissions received, the ZBA voted to deny
US Cellular's application for a variance at its May 17, 2005
hearing.  See Kozyra Decl. Ex. GG.  The ZBA found US Cellular had
satisfied only two of the sub-criteria needed to show that denial
of the variance would impose an unnecessary hardship.  Although
the ZBA found (1) that enforcement of the ordinance would
interfere with US Cellular's reasonable use of its property, and
(2) that no fair and substantial relationship existed between the
purposes of the zoning ordinance and the specific restriction on
the property for which the variance was sought, it also concluded
that approving the variance (1) would injure the public and
private rights of others, (2) would be contrary to the public

interest, (3) would not advance the spirit of the zoning
ordinance or do substantial justice, and (4) would adversely
impact surrounding property values.  See id. at 2-4. The ZBA then
issued a written denial of the requested variance.  See Kozyra
Decl. Ex. HH.

Both US Cellular and the Intervenors moved for
reconsideration of that decision, which motions were granted.
The ZBA held two more hearings on June 21 and July 19 about the
application and allowed additional testimonial and documentary
evidence from all interested parties.  See Kozyra Decl. Ex. LL.
US Cellular challenged the ZBA's finding that property values
would be diminished if the monopine were located at the Wood Hill
site, and that alternative sites were feasible.  Intervenors
sought reversal of the two findings in favor of US Cellular and a
more comprehensive explanation of the decision.

There was extensive debate about how much the facility would
detract from the views on Wood Hill and the resulting impact on
both public and private interests.  The intervenors submitted
additional information about the feasibility of different designs
and locations for a facility.  See Def.'s Opp'n Br. Ex. 24.  On
August 23, 2005, in a lengthy written decision, the ZBA affirmed

its original denial and reversed its decision on the two
unnecessary hardship sub-criteria it initially had found in favor
of US Cellular.  The ZBA concluded US Cellular had failed to
satisfy any one of the four criteria needed for a variance under
Article 13.02.B.2 of the Bow Zoning Ordinance.[3]  <u>See</u> Kozyra Decl.
Ex. OO at 2-7.

Having failed to obtain the necessary approval from the ZBA,
US Cellular commenced this action in September 2005.

    3.  <u>Substantial Evidence Claim</u>

As explained above, my review of the ZBA decision denying
plaintiff's variance application is limited to whether the
administrative record contains substantial evidence to justify
that conclusion, regardless of whether or not this court would
reach the same result.  <u>See</u> <u>Second Generation</u>, 313 F.3d at 627-
28;  <u>see</u> <u>also</u> <u>Town of Amherst v. Omnipoint Commc'ns</u>, 173 F.3d 9,
168 (1st Cir. 1999).  Plaintiff argues it does not; intervenors
argue it does.  Specifically, plaintiff contends the record does
not support the ZBA's conclusions that: (a) there is no

---

[3]Although Article 13.02.B.2 has only four factors that must
be met, the first factor pertaining to unnecessary hardship
actually consists of three sub-factors.  The total number of
criteria that are considered, therefore, is actually six, not
four.

unnecessary hardship to plaintiff because alternative sites exist
which could fill the coverage gap and address the concerns of
Town residents; (b) the facility would have an "undue visual
impact" on the Town in general and the specific neighborhood in
particular; and (c) the proposed facility would adversely affect
property values.  Plaintiff argues the ZBA was confused by the
evidence and misunderstood the Rauseo report.  The Town objects.
Intervenors argue the evidence readily supports the ZBA's
conclusion that US Cellular had not satisfied the criteria to
justify issuance of the requested variance.  The challenges to
the variance decision are addressed below, in turn.

### a.  No Unnecessary Hardship because of the Feasibility of Alternative Sites

Unnecessary hardship is the first factor to be satisfied
before a variance can be awarded.  See Article 13.02.B.2.a
(listing criteria that must be met to justify a variance); see
also Second Generation, 313 F.3d at 628 (citing Olszak v. Town of
New Hampton, 139 N.H. 723, 661 A.2d 768, 771 (1995) for the
proposition that a landowner must show the zoning ordinance
imposes an unnecessary hardship on his use of the property before
a variance can be obtained).  To demonstrate unnecessary hardship
under New Hampshire law, an applicant for a variance must satisfy

the following three-prong test:

> (I) enforcement of the zoning restriction involved, as applied to the applicant's property, would interfere with the applicant's reasonable use of its property, having regard for the unique setting of the property in the surrounding environment;
>
> (ii) no fair and substantial relationship exists between the purposes of the zoning ordinance and specific restriction on applicant's property as to which the variance is sought; and
>
> (iii) approval of the variance will not injure the public or private rights of others.

See Simplex Tech., Inc. v. Town of Newington, 145 N.H. 727, 766 A.2d 713, 717 (2001) (enunciating test).  Bow's zoning ordinance mirrors that test.  See Bow Zoning Ordinance, Article 13.02.B.2.a (I), (ii) and (iii) ("Article 13.02.B.2").

    The August 23, 2005 ZBA decision sets forth in detail how US Cellular had not met any of the three prongs for unnecessary hardship.  The ZBA found first that the intended use of the rental property may have been obstructed by denying the variance, but that use was not uniquely available at the Wood Hill site and that other reasonable uses of the property existed.  The ZBA concluded that US Cellular's use of the parcel for the proposed facility did not require the unique setting of the Wood Hill site but could reasonably be accomplished with other properties.  It

21

also found that the lessor of the parcel, Jane Strablizky, could
use the property for its intended residential purposes, either in
its current wooded state, or developed with a house either to
rent or to sell, which would offset any financial loss caused by
the termination of the US Cellular lease agreement.

US Cellular strongly objects to the finding that other
feasible sites exist to meet its coverage objectives and contends
there is no substantial evidence to support that conclusion.  US
Cellular argues the Wood Hill site uniquely fills its coverage
gap in the least intrusive manner, because of its high elevation
and wooded land.  It asserts that the Hutchins report
corroborates its conclusions that none of the 15 other sites
considered meets its coverage objectives as well as the Wood Hill
site does.

The record, however, fairly supports the ZBA's understanding
of the feasibility of alternative sites.  As an initial matter,
the evidence suggests the ZBA was motivated to find another site
in order to protect the natural beauty of the Wood Hill area and
preserve the historic, rural atmosphere of the neighborhood.  See
e.g. Letter from the Historic Commission and the Master Plan's
"Natural, Cultural and Historic Resources Inventory," Kozyra

22

Decl. Ex. D.  That is a reasonable goal that appropriately may be advanced by zoning decisions and regulations, provided it does not foreclose opportunities to provide wireless service.  <u>See</u> <u>Sw. Bell Mobile Sys.</u>, 244 F.3d at 61 (allowing municipalities to retain control over aesthetic considerations provided judgment does not mask a de facto prohibition of wireless service).

The evidence consistently demonstrated that while alternative sites might not provide better coverage than the Wood Hill site, similar, adequate coverage could be provided. Further, the Wood Hill site also did not completely fill the void.  In particular, a tower on Great Hill combined with other existing facilities would serve most of the deficient area.  The evidence also supported the conclusion that multiple smaller facilities disbursed throughout western Bow might overcome the topographical challenges that impair the effectiveness of a single tower, and could avoid the visual impact of the proposed monopine.[4]  The fact that the Wood Hill site might have been US

---

[4]Plaintiff objects to any consideration of this option, claiming the July 25, 2005 David P. Maxson letter which presented the plan, <u>see</u> Def.'s Opp'n Br. Ex. 24 (the "Maxson letter"), was not part of the record before the ZBA.  Based on the date of the Maxson letter (just one day before the deadline for written submissions, <u>see</u> Kozyra Decl. Ex. LL at 3), the Town's submission of it as part of the record, and the ZBA's reversal of its opinion about the reasonable use of the property hardship sub-

Cellular's first choice to meet its financial and technical
objectives neither militates against the feasibility of
alternative sites nor precludes the ZBA from pursuing other
options.  See Town of Amherst, 173 F.3d at 15 (explaining how
Congress reserved the Town's right to choose between competing
aesthetic, technical and financial concerns).

The ZBA next found that denying the variance would not
impose undue hardship on US Cellular because the prohibition
against the proposed monopine fairly and substantially advances
the zoning regulation's purpose of preserving the "aesthetic
nature and rustic appearance" of Bow.  Kozyra Decl. Ex. OO at 4.
Although US Cellular argues its monopine would blend into the

_____

factor in its August 23, 2005 decision, I conclude the document
was part of the administrative record considered by the ZBA.  See
USCOC of NH RSA # 2 v. City of Concord, No. 05-268, 2006 WL
2482010, *5 (D.N.H. Aug. 28, 2006) (designation of certified
record is presumptively correct).  Moreover, the concept of
multiple smaller facilities was considered well before the
submission of the Maxson letter.  The ZBA  asked about that
option at the January 18, 2005 hearing.  See Kozyra Decl. Ex. K
at 7, 16.  And the Hutchins report specifically addressed the
feasibility of constructing multiple smaller facilities on
telephone poles:  "From an engineering standpoint, the simple
answer is that they can be . . .[b]ut the main factor is
financial:  the mall or airport system usually has heavy usage
and greater revenue, along with a small geographic area, which
means coverage can be achieved at lower cost than would be the
case trying to cover Bow in this manner with today's hardware."
See id. Ex. BB at 7-8.

wooded landscape, its enormous size and artificial design would convey its industrial purposes and starkly distinguish the facility from the natural beauty and rural atmosphere of Wood Hill.  The Master Plan, the Capital Improvements Program and the zoning ordinance all intend to regulate and control development in Bow "in a manner consistent with the qualities of a typical small New Hampshire town."  Id.  By preventing the construction of the monopine, the regulation advances the stated goal of maintaining the rustic charm of the community, which still may be appropriately regulated by local zoning authorities.  See Sw. Mobile Sys., 244 F.3d at 61 (explaining how the TCA preserved for the Town traditional zoning prerogatives).

Finally, the ZBA concluded that approval of the requested variance would injure the public or private rights of others.  The ZBA explicitly found that construction of the tower "shall ensure a blight on a beautiful and scenic part of Bow" and detract from the scenic vistas the site affords.  Kozyra Decl. Ex. OO at 5.  Plaintiff contends the evidence demonstrated its monopine would not impede the scenic views from Wood Hill, and that only a few influential residents were vetoing the project. The record, however, undermines that claim.

25

First, several photographs from the balloon test clearly depict how prominently the facility would protrude above the horizon.  The balloon not only loomed large over the Herrington property, but was visible more than one mile away from the Swetts' home.  Second, while the monopine might not be directly in the line of sight of the mountain views enjoyed from the Fox property, the proposed location would render the monopine a noticeable feature on the panorama and would certainly detract from the pastoral vista.  Third, many residents opposed constructing the facility at the Wood Hill site.  Twenty residents spoke against US Cellular's application at the January 18, 2005 hearing, and two more residents objected to it at the July 19, 2005 reconsideration hearing.  A petition rejecting the proposal was signed by 36 residents; and the Town Board of Selectmen offered Town-owned parcels as alternatives to construction on Wood Hill.  This evidence wholly supports the ZBA's finding that both private and public interests would be injured by granting the variance.

In balancing the various factors to be considered in making a variance determination, the ZBA may properly weigh heavily the aesthetic values identified in the Master Plan, advanced by the

zoning regulations and articulated by the numerous residents who opposed the proposed facility.  See id. (preserving Town's traditional zoning authority); see also Town of Amherst, 173 F.3d at 14-15 (discussing the town's role in balancing the competing goals).  The record contains substantial evidence to support the ZBA's conclusion that US Cellular had not met any of the three prongs necessary to show how denial of the requested variance would cause it to suffer unnecessary hardship.  See Article 13.02.B.2.a (I), (ii) and (iii).

### b.  Undue Visual Impact of the Proposed Facility

US Cellular's second challenge to the ZBA decision contends that there is no substantial evidence to support its conclusion that the proposed monopine will have a negative visual impact. This finding encompasses the next two criteria that must be met before a variance can be granted, namely that authorization of the variance (1) will not be contrary to the public interest, and (2) will be consistent with the spirit of the zoning ordinance and, therefore, is required by substantial justice.[5]  See Article

---

[5] The ZBA's August 23, 2005 decision addressed separately the two parts of Article 13.02.B.2.c, which provides "the spirit of the ordinance shall be observed and substantial justice requires authorization of the variance."  While the pleadings reflect some confusion over the proper numerical form for the

13.02.B.2. b and c.  Plaintiff's argument here also is

unavailing, as the record amply supports the ZBA's conclusion.

　　The written and oral evidence submitted throughout the

application process consistently informed the ZBA of the public's

strong interest in preserving the scenic beauty and rustic

atmosphere of the Wood Hill rural zone.  That public support is

detailed immediately above, _infra_ § 3.a., and need not be

repeated here.  The Master Plan, the zoning regulations and the

Town Board of Selectmen's initiative all underscore the public's

desire to protect Bow from uncontrolled development and to

preserve large portions of the Town in their historic, rural

state.  The ZBA's recognition that granting the requested

variance would be contrary to the public interest is supported by

the individual and municipal interests reflected in the record.

　　The ZBA also determined that the public relies on the zoning

ordinance to ensure development is controlled in a manner that is

consistent with those objectives.  The record supports the ZBA's

finding that the public need to protect Wood Hill's unique

landscape outweighed US Cellular's need to construct its facility

on the proposed site.  The ZBA reasonably decided US Cellular

---

subsections of the variance ordinance, the substance of the
factors relevant to the analysis is exactly the same.

could locate its facility elsewhere and fill its coverage gap.
Accordingly, substantial justice dictated that the variance be
denied to promote the spirit of the zoning ordinance to preserve
the "rustic nature" of western Bow and promote the Town's quality
of life.  See Kozyra Decl. Ex. OO at 6.  While US Cellular may
disagree with the value ascribed to Wood Hill's views and natural
beauty, and the record may contain evidence of that disagreement,
it also contains evidence that reasonably supports the ZBA's
conclusion that the proposed facility will have an adverse visual
impact on Wood Hill.  Accordingly, the ZBA decision must be
upheld.  See Sw. Mobil Sys., 244 F.2d at 58 (finding substantial
evidence to uphold decision even where two inconsistent
conclusions may be drawn).

### c.  The Proposed Facility's Adverse Impact on Surrounding Property Values

Plaintiff next submits the ZBA's finding that the proposed
facility would diminish surrounding property values was not
supported by substantial evidence.  That is the final criterion
to be satisfied to justify issuance of a variance.  See Article
13.02.B.2.d.  The record contains voluminous evidence regarding
the impact of a PWS facility on property values, and the parties
spend significant portions of their pleadings arguing this issue.

29

Plaintiff argues the evidence demonstrates there is no negative impact on the value of property located near a PWS facility; defendant and intervenors argue the evidence shows there is. Even if the record is contradictory, there is enough relevant evidence to support a finding that the ZBA reached a reasonable conclusion and to uphold that decision on summary judgment. See id. (explaining deference accorded substantial evidence review).

Plaintiff attacks the ZBA's decision regarding the negative impact on property values on several fronts. First, it questions the objectivity of the independent appraiser, David Rauseo, suggesting an "inside deal" of sorts was arranged between him and ZBA chairman Hadaway whereby Rauseo would reach preordained conclusions in exchange for continued business from Hadaway in both Hadaway's role as ZBA chairman and as Chief Right-of-Way Inspector for the New Hampshire Department of Transportation ("NHDOT").  That argument is utterly unpersuasive.  The evidence shows that Rauseo was the fourth appraiser considered and the second person contacted by the ZBA, and that his professional relationship with Chairman Hadaway through the NHDOT is attenuated, at best.  See Def.'s Opp'n Br. Ex. 29, Deposition of Harry Hadaway at 48-52 (explaining both how Rauseo was selected

30

by the ZBA and the NHDOT bidding process for selecting appraisers for its public jobs).  The record also establishes that the ZBA discussed hiring Rauseo at its public hearings and selected him after reviewing his written proposal.  See Kozyra Decl. Exs. U, V and W.  These facts completely undermine plaintiff's claim that Rauseo's report was biased because of a surreptitious arrangement with Chairman Hadaway.

Plaintiff next makes a substantive assault on the Rauseo report, challenging the data used and the conclusions drawn therefrom.  US Cellular contends that Rauseo, in fact, did not utilize a comparable sales approach and did not analyze facilities or communities similar to the Wood Hill site proposal. US Cellular asserts Rauseo ignored relevant data from Manchester and Amherst because it was inconsistent with his findings.  US Cellular now claims it was error for the ZBA to reject plaintiff's contrary evidence, which this court must take into account when evaluating the variance denial.  See USCOC of N.H. # 2 v. Town of Hopkinton, 137 F. Supp. 2d 9, 15 (D.N.H. 2001) (requiring the complete record of both supporting and contradictory evidence be reviewed).

The evidence supporting plaintiff's position is strong.  US

Cellular submitted three property valuation studies with its

application, see Kozyra Decl. Exs. H, I and J, which all

consistently held that "properties in the vicinity of the []

towers described herein did not experience any diminution of

value due to the construction of the telecommunications towers

nearby." Id. Ex. H at 18.  These studies comprehensively

assessed several different communities throughout southern New

Hampshire, including older neighborhoods and new homes under

construction.  Based on the record, the sales generally were of

homes in neighborhood communities with property values less than

$200,000.[6]  The result was always the same:  PWS towers did not

have a detrimental impact on the values.  Additionally, US

Cellular submitted two critiques of the Rauseo report, which both

reiterated plaintiff's position that the data indicates no

negative impact on property values from PWS facilities.

The evidence showing a negative impact was also strong.  The

Rauseo report contained carefully hedged language, which added

credibility to its conclusions.  See e.g. Kozyra Decl. Ex. AA,

Rauseo report at 1 ("The sales data shows that in some cases the

---

[6]The property values varied, but were relatively modest
compared to the more than $900,000 the Intervenors paid for their
property abutting the Wood Hill site.  See Def.'s Opp'n Br., Ex.
10.

sales price, and most other cases the marketing time, is [sic]
sensitive to orientation of the view of a nearby tower."). While
Rauseo might not have considered all relevant data, his report
indicates a very deliberate effort to narrow the field of
properties considered to those most comparable to the Wood Hill
area, and admits the "*remaining, limited list* of comparable sales
which do not suffer from significant highway, commercial, or
other negative neighborhood influences are noted in this
analysis." Id. (emphasis added). Rauseo explains his study
excluded most comparable sales because transmission towers
typically are located near highways or commercial areas. Id. at
20. He focused his attention on properties with a view amenity
and limited his conclusion to the Fox and Herrington residences
because they offered the "90 degree or less orientation of the
tower to the primary view," which Rauseo had determined was the
benchmark for influencing property values significantly.[7]

---

[7]Rauseo explained his conclusion as follows:  "there is no
evidence that exposure to transmission towers has a negative
impact on sale price of residences.  However, the impacted
residential properties generally experience longer marketing
times.  In short, prospective buyers of these properties either
overlook the negative influence of the tower and pay market value
for the property without discounting, or no longer consider the
property.  This is supported by numerous discussions with brokers
that cite examples of homes and lots where prospective buyers
have turned away from properties which are impacted by towers.

Plaintiff takes great issue with how different the tower
influences were in Springfield and Bedford, two communities from
which comparable sales data were taken.  While plaintiff
correctly notes the Bedford "tower" was actually a windmill and
an easement for a PWS facility, and the Springfield homes were
adversely impacted by the granite ledge on which they were built
and a tower nearly three times the size of the proposed monopine,
the ZBA was aware of those distinctions and was free to evaluate
the data accordingly.  Significantly, none of the neighborhoods
included in plaintiff's valuation studies was described as having
unique views or other exceptional characteristics like the Wood
Hill area boasts.  By contrast, the Rauseo report sought out
properties with view amenities and that were located in rural
settings.  The ZBA simply could have found Rauseo's findings more
persuasive than plaintiff's results.  See Richmond Co. v. City of
Concord, 149 N.H. 312, 316, 821 A.2d 1059, 1063 (2003)(allowing

---

It is reasonable to conclude that in order to attract the more
limited quantity of buyers to purchase an impacted property
within typical marketing times, an assumption of this appraisal,
the sale price should be reduced.  Otherwise, longer marketing
times are experienced.  The intensity of this price reduction
should be adequate to be recognized by a prospective buyer.
However, as noted above, there is no evidence of sales which
support an appropriate discount to attract these types of
buyers."  Kozyra Decl. Ex. AA at 2.

zoning boards to rely on their own judgment and experience).

In short, while the record does contain contradictory evidence, it has "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Town of Hopkinton, 137 F. Supp. 2d at 15 (quoting Penobscot Air Servs. Ltd. v. Fed. Aviation Admin., 164 F.3d 713, 718 (1st Cir. 1999) (internal quote omitted)).  The comparable sales data, the photographs, and the hearing testimony all provided evidence that could satisfy a reasonable factfinder that the proposed monopine would diminish surrounding property values.

Finally, even if plaintiff had demonstrated that the administrative record does not support the ZBA's conclusion regarding diminished property values, that showing would not affect the outcome here.  Before reaching the property value issue, the ZBA had already concluded that denying the variance (a) would not impose unnecessary hardship on US Cellular, (b) would be in the public interest, and (c) would observe the spirit of the zoning ordinance and would, therefore, effect substantial justice.  See Article 13.02.B.2 (listing criteria that must be satisfied before a variance can issue).  Whether or not it concluded the proposed facility would adversely impact property

values, the variance would have been denied because US Cellular

had not met any of the other necessary criteria for a variance.

Under such circumstances, any dispute about the impact of the

monopine on property values, however genuine, does not raise a

material fact that would affect the ultimate disposition of this

matter; either way the matter arguably might have been resolved,

the ZBA's denial would still have issued.  Accordingly, I find

the record contains substantial evidence to support the ZBA's

decision to deny US Cellular's variance application.

     4.  The Effective Prohibition Claim

     US Cellular's final challenge to the ZBA's denial of its

variance application contends that even if the decision is

supported by substantial evidence in the administrative record,

the denial effectively prohibits US Cellular from providing

wireless service and, therefore, must be reversed.  See 47 U.S.C.

§ 332 (c)(7)(B)(i)(II) (limiting the power of local regulators if

their decisions have the effect of prohibiting the provision of

wireless service).[8]  The anti-prohibition clause extends to

---

     [8]The anti-prohibition provision presumes that, in a disputed
case, a gap in wireless service exists that local regulations are
preventing providers from filling.  See Second Generation, 313
F.3d at 631-35 (rejecting the "any service equals no effective
prohibition" rule to focus on the consumer's need for service by
its particular provider); see also Nat'l Tower, 297 F.3d at 20

36

individual denials that "effectively prohibit" wireless service if the provider can show either (1) that "the town sets or administers criteria which are impossible for any applicant to meet," or (2) that its application is the only feasible plan to fill the gap in service.  Second Generation, 313 F.3d at 630. The burden of proof falls on the provider and demands a showing "from language or circumstances not just that *this* application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Town of Amherst, 173 F.3d at 14 (emphasis in original).  US Cellular has not met its burden of proof with regard to any of these showings.

US Cellular makes four arguments in support of its effective prohibition claim.  Essentially it argues that to provide service it must be granted a variance, and that based on the ZBA's decision, it is impossible to satisfy the criteria required to obtain that variance.  Each of the four arguments is addressed below.

### a.   Impossibility of Meeting Criteria

(holding that decisions which prevent the closing of a significant gap in service violate § 332(c)(7)(B)(i)(II)).

Plaintiff first argues the zoning regulations set forth criteria that are impossible to meet and, therefore, it cannot satisfy the requirements to obtain a variance.  It is undisputed that US Cellular has a gap in service in the western and southern portions of Bow, which had all been zoned rural or residential and had all disallowed PWS facilities, mandating that US Cellular obtain a variance in order to fill its coverage gap.  Since this action began, Bow has amended its zoning ordinance and now allows PWS facilities throughout the town with a conditional use permit. See Ints.' Mem. Summ. J., Ex. A (amended Article 7.10).  As a result, plaintiff's argument that the bases for denying its initial variance application evidence the impossibility of obtaining a variance in the future is unpersuasive and inapposite.  A PWS facility is now a zoned use in the rural areas where plaintiff needs to fill its coverage gap.

### b.  The Only Feasible Plan

The issue of whether or not US Cellular can fill its coverage gap with a plan other than the proposed monopine at the Wood Hill site is the very core of the instant dispute.  As discussed above, the record is replete with evidence about the technical feasibility of alternative sites and the challenges

presented by Bow's topography and zoning regulations.   For
purposes of summary judgment, however, the issue is simply
whether a factual dispute exists pertaining to whether the ZBA
decision to deny US Cellular's variance application demonstrates
that the Town has effectively prohibited US Cellular from
providing wireless service to its customers in Bow.   Plaintiff
argues the undisputed evidence shows not only that its plan is
the only feasible plan, but that the ZBA's hostility to the
proposal demonstrates subsequent efforts to put forth another
plan would be futile.   The record supports the opposite
conclusion.

It is undisputed that many alternative sites are available
to plaintiff.   Although US Cellular provided detailed analyses of
why it had rejected those alternative sites, a careful review of
the record indicates that decision was not based solely on
technical infeasibility, but rather considered a host of factors
relevant to the business judgment about where best to locate a
facility.   <u>See</u> <u>e.g.</u> Kozyra Decl. Exs. L and Z.   While US Cellular
may have legitimate reasons for preferring the Wood Hill site to
alternative locations in western Bow, its preference does not
eliminate the feasibility of alternative sites.   <u>See</u> <u>Town of</u>

<u>Amherst</u>, 173 F.3d at 14–15 ("Under the compromise set out in the TCA, developers of wireless networks are not entitled to locate facilities wherever they wish to, nor are local governments required to approve the "best" or most economical siting proposals. . ..").  The ZBA's decision to reject the variance application for the Wood Hill site, therefore, does not support a claim for effective prohibition.  See <u>Second Generation</u>, 313 F.3d at 635 (denying effective prohibition claim where provider failed to show alternative efforts had also been denied); <u>see also</u> <u>Town of Amherst</u>, 173 F.3d at 15 (denying effective prohibition claim where provider declined to present serious options to the town); <u>see also</u> <u>Sw. Mobil Sys.</u>, 244 F.3d at 63 (requiring provider to "develop a record demonstrating that it made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers").

The record also consistently demonstrates a concerted effort on the part of the Town to reach a compromise with US Cellular to enable it to satisfy its coverage needs and to allow the Town to preserve its rural character.  The proffered Town-owned parcels, the studies showing the feasibility of multiple, smaller facilities in lieu of one, high tower, and the amended zoning

ordinance demonstrate that another site likely could be
identified that would be acceptable to both US Cellular and the
Town.  These good-faith efforts belie any present claim of
hostility on the town's part toward US Cellular's efforts to fill
its coverage gap.  <u>Cf.</u> <u>Town of Wayland</u>, 231 F. Supp. 2d at 408-
09 (lengthy record of repeated delays and denials showed town's
effective prohibition).  Under the circumstances as currently
presented to the court for consideration, I cannot conclude "that
further reasonable efforts are so likely to be fruitless that it
is a waste of time even to try."  <u>Town of Amherst</u>, 173 F.3d at
14.[9]

     The record contains no genuine issue of material fact as to
whether the Town has effectively prohibited US Cellular from
providing wireless service to its customers in Bow.  Although US
Cellular's variance application was denied, nothing in the record

_____

     [9]I reach this conclusion recognizing that US Cellular still
will need town approval of any future construction plans, both to
obtain a conditional use permit and site plan approval, and
possibly also a height variance.  My review of the administrative
record, however, leads me to believe the Town recognizes its
obligation to accommodate US Cellular's right to fill its
coverage gap, and will work with US Cellular to seek a solution
that is more mutually acceptable.  <u>See</u> <u>Second Generation</u>, 313 F.3d
at 630 (recognizing how local authorities are aware of the
preemptive power of the TCA and wisely consider it when making
their decisions).

supports the conclusion that the Town will deny any future application it might submit, so that its actions can be understood to effectively prohibit the provision of wireless service.  The undisputed evidence demonstrates wireless facilities are now a permitted use in every part of Bow, and other sites in the Town could, in some combination of facilities, provide service to fill US Cellular's coverage gap.  US Cellular, therefore, has not been effectively prohibited from providing the needed wireless service.

## Conclusion

For the reasons set forth above, I recommend that plaintiff's motion for summary judgment (document no. 25) be denied, and intervenors' cross-motion for summary judgment (document no. 45) be granted.  While this ruling may prohibit this tower within the Town, the law clearly entitles US Cellular to provide the service it seeks to provide and entitles it to obtain the requisite approvals needed in order to fill any significant gaps in its coverage.  Rather than proceeding with a series of applications and denials and ending up back in federal court, the parties would be well advised to seek out a solution

that recognizes their respective goals.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____

James R. Muirhead
United States Magistrate Judge


Date:    April 2, 2007

cc:      James P. Bassett, Esq.
         Paul T. Fitzgerald, Esq.
         Steven E. Grill, Esq.
         Jeffrey C. Spear, Esq.

43